UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| RICARDO DIAZ, | ) | | |
|---|---|---|---|
| | ) | | |
| Movant, | ) | | |
| | ) | | |
| v. | ) | Case No. | CV410-028 |
| | ) | | CR408-088 |
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Respondent. | ) | | |

# REPORT AND RECOMMENDATION

Ricardo Diaz moves over the government's opposition for 28 U.S.C. § 2255 relief. (Doc. 1.[1]) For the reasons that follow, his motion should be **DENIED**.

Diaz, a multiple felon who has been implicated in several large scale drug trafficking and money laundering schemes,[2] was indicated on

---

[1] Unless otherwise noted, citations are to the docket in movant's civil case, CV410-028. "Cr. doc." refers to documents filed under movant's criminal case, CR408-088.

[2] According to the Presentence Investigation Report ("PSI"), Diaz pled guilty in 1994 to distributing over 230 kilograms of cocaine in a five year period. (PSI at 8 ¶

two drug related conspiracies: first, conspiracy to import more than one kilogram of heroin, and second, conspiracy to distribute it. (Cr. doc. 1.) Per a plea agreement, the first count was dismissed in exchange for his plea of guilty to a lesser included distribution offense as to the second count. (Cr. docs. 15, 16, 19 & 22.) The Court sentenced him to 100 months' imprisonment to be served consecutively to any supervised release revocation imposed by the Southern District of Florida, where he was still under supervision for a 2004 money laundering conviction. (Cr. doc. 25.) He did not appeal his conviction or sentence. He seeks § 2255 relief in this Court.

Diaz's § 2255 motion raises a single claim for relief:[3] he alleges that his retained counsel, Stephen Golembe, rendered ineffective assistance by failing to investigate the facts and circumstances underlying the charges against him prior to advising him to plead guilty.[4]

---

30.) At the time of his arrest, officers discovered two kilograms of cocaine in his vehicle. (*Id.*) After his release on that conviction, he pled guilty in a nearly two million dollar money laundering scheme. (*Id.* at 9 ¶ 31.)

[3] In his initial pleading, he also claimed that the government violated his Fifth Amendment rights by not disclosing that its sole witness had provided materially false information. (Doc. 1 at 3.) He has since withdrawn that claim. (Doc. 9 at 18.)

[4] Claims not raised on direct appeal are generally barred from consideration in

(Doc. 1 at 3.) Specifically, Diaz asserts that the government's "sole witness"[5] against him -- his cousin Osvaldo Badosa -- lied in his reports to the government and that Golembe should have further investigated the matter prior to advising him to enter a guilty plea. (Doc. 2 at 35.)

A defendant who enters an unconditional plea of guilty "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) (emphasis added). That is, "[a] defendant's plea of guilty, made knowingly, voluntarily, and with the benefit of competent counsel, waives all non-jurisdictional defects in that defendant's court proceedings." *United States v. Pierre*, 120 F.3d 1153, 1155 (11th Cir. 1997) (citing *United States v. Yunis*, 723 F.2d 795, 796 (11th Cir. 1984)); *see also United States v. Patti*, 337 F.3d 1317, 1320 (11th Cir. 2003); *United States v. Fairchild*, 803 F.2d 1121, 1124 (11th

---

§ 2255 proceedings. *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004) (§ 2255 is not a substitute for a direct appeal, so claims not raised on direct appeal are procedurally defaulted and need not be reviewed during § 2255 proceedings). Claims of ineffective assistance of counsel, however, are not subject to the procedural default rule. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

[5] While Badosa certainly implicated Diaz, he was not the "sole" witness against him.

Cir. 1986) (per curiam). That bar applies both on appeal and on collateral attack. *See United States v. Broce*, 488 U.S. 563 at 569 (1989). Hence, Diaz may only attack the plea itself, and here he does so by arguing that Golembe's ineffectiveness undermined the plea.

In such cases, the Court is guided by *Hill v. Lockhart*, 474 U.S. 52 (1985), which advanced a slightly modified version of the two-prong ineffective assistance of counsel test first announced in *Strickland v. Washington*, 466 U.S. 668 (1984). Where a movant enters a plea of guilty and then collaterally challenges it as involuntary due to constitutionally deficient representation, he must first demonstrate that his attorney's performance was deficient, which requires a showing that counsel's advice regarding the plea was outside the "range of competence demanded of attorneys in criminal cases." *Hill*, 474 U.S. at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)); *see Tollett*, 411 U.S. at 267. Then he must demonstrate that the defective performance prejudiced the plea process to such a degree that the plea cannot be trusted. *Hill*, 474 U.S. at 59. Where the alleged deficiency of counsel is a failure to investigate or discover potentially exculpatory evidence, the

prejudice showing will depend on the likelihood that the evidence would have led counsel to change his recommendation as to the plea, and thus whether the evidence would likely have changed the outcome of the trial. *Stano v. Dugger*, 921 F.2d 1125, 1149-51 (11th Cir. 1991); *McCoy v. Wainwright*, 804 F.2d 1196, 1198-99 (11th Cir. 1986).

A brief review of the facts leading to Diaz's conviction is in order. On November 29, 2007, agents from the Drug Enforcement Administration, Immigration and Customs Enforcement, and Customs and Border Protection seized three kilograms of heroin from a Russian national who was on a ship that had docked in Savannah after sailing from Cartagena, Colombia. (Cr. doc. 19 at 21.[6]) The agents arrested the Russian, who informed them that the drugs were to be delivered to a man coming up from Miami, Florida. (*Id.*) The Russian agreed to assist the agents in a controlled delivery. (*Id.*) On December 1, 2007, the agents allowed the Russian to meet with his contact, Osvaldo Badosa, who arrived with $4000 in cash to exchange for one kilogram of the heroin. (*Id.*; doc. 2-1 at 12.) The agents promptly arrested Badosa, who

---

[6] This information comes from DEA Special Agent Robert Livingston, who testified at the Rule 11 change of plea hearing. (Cr. doc. 19.)

also agreed to cooperate. (Cr. doc. 19 at 21.) He identified individuals in Miami that arranged to have the heroin picked up, including a Colombian and defendant Diaz. (*Id.*) At the time of Badosa's arrest, Diaz called him on his cell phone. (*Id.*)

The agents prompted Badosa to make two recorded calls to Diaz. (*Id.*) "[D]uring [one] conversation [Badosa] said that he had gotten the three and everything was okay. Diaz continued to ask if everything was alright and said that he sounded nervous. And that was pretty much the end of that." (*Id.*) After Diaz's subsequent arrest, he sat down with Special Agent Livingston and an agent from Miami and admitted his involvement in the scheme but stated that Badosa had actually negotiated the transaction. (*Id.* at 22.) During later interviews, Diaz admitted to facilitating the transaction by renting a vehicle for Badosa and acting as a liaison between Badosa and "the Colombian." (*Id.*) Diaz reaffirmed his complicity at the change of plea hearing:

> MR. DIAZ: There was a Colombian national which me and my cousin [Badosa] know. Prior to his arrest, a week or two prior, they were soliciting to pick up narcotics up here in Savannah. The day that my cousin left to come pick up the -- my cousin agreed

6

| | because of his financial difficulty that he had, and he wanted -- came up here -- he was going to come up here to pick it up. So he came to me to borrow some money. I lend him the money. I knew at the time what he was going to do. I took him to rent a car. He could not rent a car because he didn't have enough room on his credit card. So my poor judgment, I rented the car for him. He came up here. He called me when he was up here. I did speak to the Colombian when he was -- when my cousin was up here. The Colombian came. He called me because he couldn't get a hold of my cousin, so I repeatedly called my cousin until he called me back. And he did tell me that he -- you know, I did ask him if he was nervous and all that. And that's about it. I was more concerned 'cause I wanted him to get the car back to Miami. I was making no profit. That deal was between him and the Colombian. |
|---|---|
| THE COURT: | Did you know that the transaction that your cousin was involved in and that you were assisting him in involved narcotic drugs? |
| MR. DIAZ: | Yes, Your Honor. |

(*Id.* at 23.)

That account, until now, was not in dispute. In his recently-minted declaration, however, Diaz paints a different picture. Now he denies that

he was ever involved in the drug conspiracy. Instead, he was a well-meaning and kindly laundromat employee who was mistakenly targeted by the government for helping out his troubled cousin. (Doc. 2-1 at 2.) For years Badosa had been a scourge on the family due to his substance and alcohol abuse, and he had even escaped from prison in Ecuador where he was incarcerated for a drug offense. (*Id.*) Badosa, *the* bad guy in this tale, "lacks a sense of responsibility." (*Id.*)

The new story line dials back to an earlier time: While in Miami, Badosa's Ecuadorian wife sent him $4,000 to purchase a car. (*Id.*) He did not do so and instead wasted the money. (*Id.*) So during the last week of November 2007, Badosa approached Diaz for a $4,000 loan to buy a car. (*Id.*) Diaz, hopeful that Badosa was finally "getting his act together," lent him the money. (*Id.*) A few days later, on Friday November 30, 2007, Diaz gave Badosa a ride to a Thrifty Car Rental location under the impression that Badosa was renting a car for "local purposes only." (*Id.*) After dropping him off, Badosa called Diaz to tell him his credit card was declined, so Diaz went back and rented the car using his own credit card and signed the rental agreement. (*Id.* at 2-3.)

"Unbeknownst" to Diaz, Badosa had been working with a mutual acquaintance, Gilberto Valasquez, a Colombian, and "word on the street" was that Valasquez was involved in drug trafficking. (*Id.* at 3.)

Badosa, Diaz now claims, "never told me when I loaned him money or rented the car for him that he was dealing with Valasquez against my advice, or that he needed the money or the car for a drug deal in Savannah (or anywhere else)." (*Id.*) On Saturday December 1, 2007, the date of Badosa's arrest, Diaz called Badosa to ask him to come by the laundromat to help with some painting, but Badosa said that he was out of state, in Savannah. Diaz states,

> I blew up at him, asking him how he could have taken the car out of the State and that my posterier [sic] was on the line financially if anything happened, especially in violation of the rental agreement. I demanded to know what he was doing in Georgia, and he said he was working on a deal with Valasquez. I demanded to know whether it was a drug deal, and he admitted it was. *I had no idea until that moment* that that was what Osvaldo was up to, and I chastised him for his stupidity, and especially because I felt he had deceived me to get me to loan him money and rent him a car.

(*Id.* at 4 (emphasis added).) Later that morning, Diaz continues, "[t]hings went from bad to worse." (*Id.*) Valasquez called, complaining that he could not get in touch with Badosa. (*Id.*) Concerned for his

cousin, Diaz again called Badosa to tell him about Valasquez and to ask him to return Valasquez's call. He also told Badosa to tell Valasquez to leave him out of the loop, since he wanted nothing to do with the deal. (*Id.*) The last call was made at the time of Badosa's arrest. (*Id.*)

Wrapping the new story line up, Diaz insists that Badosa's later statements to the arresting agents implicating Diaz in the scheme were simply false. (*Id.* at 5.) Indeed, Badosa even sent him an affidavit, of his own free will, stating as much.[7] (*Id.*) Badosa needed no go-between with Valasquez because he had Valasquez's telephone number on his phone.[8] (*Id.* at 7.) He just played coy with the agents, implicating Diaz, in order to allow Valasquez time to escape to Colombia, which he promptly did. (*Id.*) And had Diaz's attorney, Golembe, investigated the matter by interviewing Badosa and obtaining other evidence, he would have known that the statements were false and thus would not have pressured Diaz

---

[7] Badosa states that Diaz knew nothing about the deal prior to the morning of his arrest. (Doc. 2-2 at 2-3.) "I mislead [sic] the authorities by calling my cousin, Ricardo Diaz Jr. making them think he was involved because he was calling me." (*Id.* at 2.)

[8] This of course ignores the fact that Diaz admittedly helped put Valasquez in touch with Badosa after he knew that Badosa was involved in a drug deal with Valasquez.

to take a plea. (*Id.*; doc. 2 at 31.) In conclusion, Diaz now insists that

> [i]f I had known what [Badosa] had told the government about me being the 'go-between,' about him not knowing the Colombian's name, about him not having the Colombian's number . . . I would not have pled guilty. Instead, I would have gone to trial, because except for [Badosa] and some other evidence that did not really involve me in this conspiracy, the government had no evidence placing me in this deal between [Badosa] and Valasquez. That's because I was not in the deal. My only offenses were helping out family -- as everyone in the family has done where [Badosa] is concerned -- and wanting to get the rental car and a cousin back safely.

(Doc. 2-1 at 8.)[9]

Diaz's new story line is fanciful and utterly specious. Despite his contention that Badosa would have exonerated him, Badosa's exoneration would have been worthless. After all, Badosa is a convicted drug dealer, and the jury would know that he had every incentive to lie

---

[9] He explains away his plea admission by stating that the Court misled him into believing that the offense underlying the conspiracy was a strict liability offense. (Doc. 2 at 34.) The judge, he says, carefully explained the elements of conspiracy but failed to explain the elements of the underlying offense. (*Id.*) Somehow, this led him to believe that he could be guilty of conspiring to distribute heroin even though his actions had only "incidentally" and "unintentionally" advanced the conspiracy. (*Id.*) Diaz makes this assertion after having been convicted in two other conspiracies, one of which involved the distribution of cocaine. (PSI at 8-9.) Moreover, he admitted on the record that he read the indictment and charges against him and reviewed them with his attorney. (Cr. doc. 19 at 10-11.)

to obtain leniency for his cousin.[10] Badosa's testimony would have done little to overcome the mountains of circumstantial evidence implicating Diaz in the conspiracy, and circumstantial evidence of an agreement may provide sufficient grounds to secure a conviction for conspiracy. *See United States v. Pintado*, 715 F.2d 1501, 1503 (11th Cir. 1983) (under 21 U.S.C. § 846, "the government must prove there was an agreement by two or more persons to violate those laws and that the individual defendant was one of the parties to that agreement", that agreement can be established through direct or circumstantial evidence, and a defendant need have knowledge only of the primary objective of the conspiracy). While Diaz offers reasonable sounding explanations for his involvement with Badosa, his name appears at every level of the conspiracy. Diaz provided Badosa with the money for the deal; Diaz rented the car that Badosa used to drive to Savannah; Diaz called

---

[10] Additionally, Golembe could not have approached Badosa directly, for he was represented by counsel. Badosa's attorney, Paul Petruzzi, forwarded an unsigned copy of the Badoza affidavit to the United States Attorney's office with a letter stating that the affidavit had been sent to Badosa by Diaz and his father and possibly constituted an attempt to suborn perjury and/or obstruct justice. (Doc. 6-1 at 2.) In view of that letter, it strains believability for Diaz to argue that Badosa would have offered any aid prior to his own sentencing, when he faced substantial risk for endeavoring to mislead the Court about his cousin's involvement.

Badosa during the plan's execution; Valasquez was a mutual acquaintance who had Diaz's telephone number and who called Diaz to check on Badosa; and Diaz later admitted to the district judge that he knew he was assisting his cousin in a drug deal.

Nor is it critical that Badosa later lied to the agents, falsely stating that he did not have Valesquez's number. (Doc. 2-1 at 7.) A jury could easily conclude that Valasquez, who appears to be a major player in the drug trade, used Diaz, a relative small fry, as a go-between in order to place the risk of an intercepted conversation upon Diaz while giving Valasquez time to escape should the deal go south -- making Diaz the fall guy. That is, the fact that Diaz "didn't need to be the intermediary between Osvaldo and 'the Colombian'" does not mean that Diaz did not, in fact, act as an intermediary, as he now suggests. (Doc. 2-1 at 7.) Moreover, Diaz even now admits that he knowingly involved himself in the conspiracy by attempting to put Valasquez, the Colombian, in contact with Badosa after Badosa informed him that he was involved in a major drug deal with Valasquez. However "unwilling" his participation, he nevertheless (in his revisionist history) inserted himself into the

situation and did, in fact, act as a go-between.

With so much evidence against him and only an incredible account by an associate, who is also a family member, exonerating him, the Court cannot see how Golembe performed deficiently by advising Diaz to plead guilty without further investigation. And even if he did perform deficiently, Diaz has not shown prejudice on these facts. Taking Diaz at his word, he advised Golembe that Badosa had lied, he knew through family members that Badosa wanted to help him, and he advised Golembe of that fact. (Doc. 2-1 at 6-7.) Both Golembe and Diaz were aware of the possibility of a recantation yet Golembe did not pursue the matter, and Diaz, aware that Golembe had not pursued the matter, still chose to plead guilty, effectively waiving the option of pursuing that strategy.[11] Indeed, Diaz's own actions show that he put no stock in Badosa's help. It is unsurprising, since Badosa's after-the-fact affidavit is so clearly incredible that even had Badosa offered that testimony at trial, it would not have helped Diaz. *See Watson v. United States*, 2008

---

[11] Additionally, Badosa admits in his affidavit that his attorney advised him to take no action to aid Diaz since "it was not in [his] best interest." (Doc. 2-2 at 3.) Hence, it is highly unlikely that Badosa would have met with Golembe or rendered any aid despite Badosa and Diaz's after-the-fact insistence that he would have done so and would have testified on Diaz's behalf at trial. (Doc. 2 at 7; doc. 2-2 at 3.)

14

WL 794578 at *5 (D. Md. Mar. 21, 2008) (affidavits from co-defendants suffered from a lack of credibility and were unlikely to have resulted in a favorable outcome for movant had he gone to trial); *Diaz v. United States*, 377 F. Supp. 2d 652, 654 (N.D. Ill. 2005) (same); *see also United States ex rel. Morris v. Carter*, 2000 WL 1230220 at *6 (N.D. Ill. Aug. 22, 2000) ("It is not altogether unsurprising that someone who has already pled guilty to a crime might be willing to sign an affidavit admitting his guilt and insisting that his co-defendant is innocent.").

Diaz's ineffectiveness claim is meritless. Accordingly, his § 2255 motion (doc. 1) should be **DENIED**. Applying the Certificate of Appealability ("COA") standards, which are set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009) (unpublished), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue. 28 U.S.C. § 2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving sua sponte denial of COA before movant filed a notice of appeal). And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good

faith. Thus, in forma pauperis status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED** this  2nd  day of July, 2010.

_____
**UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT of GEORGIA**